05-644 Country Mutual Insurance v. Higgins Green & White Landscaping, Inc. Ed Grassi, on behalf of Light & Power and Higgins, and I anticipate 10 to 15 minutes. Keith Carlson, on behalf of Planned Parenthood and Country Mutual, I anticipate 10 to 15 minutes as well. Ed Grassi, on behalf of Planned Parenthood and Country Mutual, I anticipate 10 to 15 minutes. In this case, I believe that summary judgment should have been granted in favor of Leighton Power and Higgins on this matter, and that the court did err in this, but as we all know, this is a de novo review. To the extent that I will discuss the underlying court's opinion, the only thing I would like to address is the fact that she seemed to focus on a precipitating cause. That was the language that she used in deciding the case, and I've gone back after that hearing to try to find exactly where she might have come up with that phrase, and I'm not really sure where it comes up with. There are many cases that address the auto exclusion and whether it applies, but in this case what we have is something that's not been addressed in any of these cases that I can find, and that's the maintenance aspect of the auto exclusion, not whether there's use of an auto, it's the maintenance of an auto. Why did you bring the truck into the building? Higgins was the one that needed to do the maintenance on the truck. My client originally was Leighton Power. I only represent Higgins now following the trial through an assignment. Higgins needed to use the garage. The gentleman from Leighton Power did not know what was being done. They just said, because they're neighbors. The truck was brought in after the scandal. Correct. And there's no dispute in this case that there was maintenance that had happened at some point on the truck. We're not disputing that. The question is, do the facts of this case specifically apply to the exclusion to the point that it would apply to exclude coverage? In every one of these cases that's addressed this exclusion, there has always been some aspect of use or ownership or maintenance that precipitated the need to analyze the exclusion. Every one of these cases, even ones where the exclusion was held to not apply, involved the use of an auto at some point. But when you look at the totality of the facts and the totality of the circumstances, in all of those cases, the courts looked to the conduct that led to and caused the injury and the damage. Similar, the Mount Vernon case versus helping hands where the child was left in a van for eight hours. There was definitively use of the auto at some point before that. Just as in here, there was maintenance of the auto at some point before that. The question is, how does that exclusion and the facts of this case apply? Well, having written Mount Vernon, as I point out in it, the van was not being used at all when the little kid died of suffocation or heat stroke in the van. So it was left unattended in the van for eight hours. It was attenuated then to death, reading from the opinion, the actual legitimate purpose of the van. The transportation of the children in the van was legitimate purpose, but the deserting of a small child for an extended period of time was not. And so it's non-vehicular conduct is what I found along with my partners at the time, this division. Because in there they had many other going on. You have, in this case, the complaint alleges various bad things, notably the negligence in using the acetylene torch. It catches the bucket, not opening the door, removing the bucket, then the bucket melts, and all this is the fault of the person who was using the acetylene torch. But in that case, the allegations were that the people didn't count the children as they came in. So nobody even noticed that a child was melting out in the van. So this is somewhat different. It is close, as we do, I just speak to death as I always do, the issues of use of a car, use of a vehicle. But there I made sense it wasn't being used. And you'd have to agree, if you did, that this car was being, the truck was being maintained. So what occurs, does it rise out of the maintenance of the vehicle? So this is somewhat different. Go ahead. Two points I'd like to raise in response to that. The next sentence that you used in that specific Heaven's Little Hands case is that the allegations in the complaint assert multiple theories of negligence, including a failure to maintain a proper census of the children. And in the sentence before that, you referred to the non-vehicular conduct. In all of these cases, what you have is analysis of the conduct and how it relates to the exclusion. In every case in which the exclusion has been upheld, the only cause of the incident is always related to the use of the auto. When you have the negligent supervision claims, when you have the bus case, the Northbrook case, where you have the negligent bus routes, the failure to train, when you have the cases of the negligent modification of the seat in the Perez case, which I believe you also concurred in that opinion. All of those cases surround the, you can't separate the use of the vehicle from the damage and injury that's caused, whereas in this case you can. The maintenance is but one aspect of the cause of this. Now, there have been plenty of cases after USF&G that specifically say you can't use a proximate cause causal relationship test here, but in the end, that's kind of where you try to form around that without specifically using it, but the Perez case, the Mount Vernon case, all upheld the fact that the USF&G logic that when there are multiple causes, one of which is covered, one of which is not, the exclusion does not apply. Now, here we do have maintenance of an auto. As I said, I'm not denying that he was in there working on the truck. The issue that we have in this case, though, is that before the maintenance occurred, there was negligence. The negligence of this man. He walked around the entire area. He looked. He saw the bucket. He saw that there was a bucket there of what appeared to be potentially flammable material and decided to use a torch anyway. He could have moved the bucket. This whole thing is prevented. That occurred before the maintenance. Then he does the maintenance on the truck. A spark flies and lands in the bucket, and now we have a separate conduct that could lead to the cause of the fire, and then he's attempting to move the bucket. It almost sounds the way from his deposition. It almost sounds like a Keystone cops routine where he's picking up the bucket, moving it, and then eventually the whole thing goes all over and lights the building on fire. But the conduct of the man from Higgins, the two gentlemen from Higgins, in causing this fire, it's not solely the maintenance. You can't say that only the maintenance is the only thing that caused this fire, which is what you can say in the Northbrook case, in the Perez case, all of the negligent supervision cases. You can always say without the use, you have no damage. But here we have other causes, and I think it's very important to note that the USF&G logic is specifically upheld in both the Perez case and in the Mount Vernon case. The USF&G logic, again, is if you have multiple causes, one of which is covered, one of which is not, then that one, the covered cause still, the exclusion then does not apply. The USF&G was the case where the minor child was in the car. Correct. And the minor child, I guess, opened the door some type of way, and the issue was whether the automobile insurance coverage was covered or whether there was another intervening act. And they indicated that the minor child in that case, had the minor child had supervision, they never would have opened the door. So you're saying that this is the same as that? No. No, I don't think that I'm saying that. Because that case involved, and the logic of that, the child doing that in the supervision, that's where they went to the intervening act, whether there was an intervening act. And that aspect of USF&G appears, at least to me, to have been overruled by Northbrook and to be held not to be the way to analyze these cases and all the ones that have been subsequent to it. But the Perez case and the Mount Vernon case specifically said that that aspect of USF&G, when there are multiple causes, one of which is covered and one of which is not, I'm not trying to equate the facts of this to the USF&G court because I think the facts are very different. And I think the USF&G cases might have even been decided differently had they been presented today because those were negligent supervision cases. Well, it's all made up. Excuse me. I know I cited it in little hands, but I think USF&G is made up. When Judge Justice Rizzi wrote that, he doesn't have a single case of the property for his holding at all. What he had in front of him was a quadriplegic child and nobody else with insurance other than the – Ben, take your water. Go ahead. I'm just pontificating. He has a quadriplegic child in front of him, and then he cites without citing any cases as well. No, there are other accounts. I mean, the child fell out of a car, and he found it was still liable. The auto exclusion didn't apply to the child falling out of a car. That's crazy. And so while I have to cite and discuss it in my case, I don't really say it's great news or it's well-written or correct even. I just say Northbrook – I just rejected the idea that Northbrook reversed USF&G. I'm trying to say I share your concern right now. If you don't think it would go that way, I don't think anybody would write USF&G now. It wouldn't be done. If it would, it would be Rule 23, and we'd hide it. But nobody would say that it was the correct way to go. And I would agree with that, but I don't think – I do think that even in your opinion and then in the Perez case, that one specific section of the USF&G logic is said to still be the law when there are multiple causes, which, again, that is exactly what we have here. I think one of the easiest ways to boil down all of these cases in which the exclusion is upheld or overturned – I'm sorry, not held to exclude the injury – in all of those cases, if you were to ask the question, can you prove an underlying tort case without ever mentioning the auto or the maintenance, could you ever prove a case without ever addressing the fact that there was an automobile involved or maintenance of an automobile involved? If you can prove a case on theories completely separate from the automobile itself, then I don't think that the exclusion could apply. And in this case, that's exactly what we have. And I know that to be true because I did prove a case in this specific case by never mentioning a truck existed. All I said and all the testimony that came out of the trial is that this man used a torch which lit a bucket on fire. And then that bucket, the attempts to move it, led to the building starting on fire and being completely destroyed. This case is able to be proven and was able to be proven to the trier of fact without ever mentioning that there was a truck involved. You can't do that in the negligent supervision cases. You can't do that in the bus case. You can't do that because the only way to prove that an injury occurred is to prove that there was use of the auto. Now, I'm not saying that I'm trying to change the law or modify it. I'm saying that I'm trying to take all these cases and consolidate them and figure out what's a way to approach these to figure out when the exclusion applies because obviously they're all fact-dependent. But we agree with you on that. And I like that. And the briefs are great in this case. And your theories are wonderful, even if we disagree with them. If we were to agree with you, that would be the standard thing on an exclusion. If the case could be proven for liability of the insured without mentioning the excluded act, in this case an automobile, we would read the exception out of the policy. That would happen on every case. Would it not? No, I don't think so. Say you had a situation where there's, and again, there's no case that really addresses the maintenance aspect, so you'd have to equate them. There's some cases on maintenance. I've written some. Just because you maintain a car, you're working on a car in a garage, not so much fires, but the car falls off of the lift. The guy's driving the car backwards while he's returning the car. Runs over an old woman, Sears. I don't remember the name of the other party. Oh, I'm sorry. There are several maintenance cases out there. But none of them like this. I mean, this is different. There's no question. This car's not being moved. Right. So you have the argument that the additional, the actual analogy to little hands of saying, well, this car's not being moved. It's not being used as a car at the time the truck's not being moved. It's not being used as that. There's no question it's being maintained. There's definitely maintenance going on. I don't dispute that. But I don't think you're writing the exclusion out of the policy, right, because every one of these is going to be fact determined. In this specific case, we have facts that go outside the maintenance. Your situation of a truck or a car falling during the course of the maintenance, that would clearly invoke the policy. If the spark landed and hit a gentleman in the eye and he claimed injury as a result of that, that clearly arises out of the maintenance because you can't separate the two because it happens right there. But in this case, we have all different facts that in this case, this gentleman knew that the bucket was there, knew it was potentially flammable, didn't move it. Then after he starts it on fire, he dumps it all over the ground. The facts here are different. And in these facts, I don't think that it would apply. But if the, as you just said, and again, this won't go with the closing arguments, if you think, if you believe that the exclusion could apply or would apply, if the fellow who's using the acetylene torch, a spark flies out and hits his partner or a customer or somebody, if the exclusion applies, how doesn't it apply here since it's the same spark, instead of hitting a human being, it's hitting a bucket of flammable liquid? Because of the attenuated other causes. If the situation is, in that case, like I was saying, you have a guy using a torch and the only thing is, is while using the torch to cut this, he puts a spark in the eye, the more I think about it, I'm not even sure that that would be as good of an example because I think there's still an argument that the exclusion wouldn't apply if there are other causes. And that's the key is what I'm talking about here, the other causes. But going back to your point of writing the exclusion out of the policy, the case law is clear that the theory used is not what determines it, what determines whether the exclusion applies. Otherwise, then I think that you would be correct. Any plaintiff could come in and allege any theory. It's not simply the theory that I allege and that I can prove that determines whether the exclusion applies. But I think when you look at the theory that is out there and the causes that are related to it and how they relate to the exclusion, then in this case, you do have certain causes that are completely unrelated. And I think that goes back to your statement in the Mount Vernon case. The nonvehicular conduct, you know, I don't have, you could say that the failure to move the bucket is nonvehicular conduct. The efforts to put out the fire is nonvehicular conduct. The efforts to, the picking up of the bucket and moving it to an area that probably exacerbated the fire, that's nonvehicular conduct. We don't have a situation where all that happened is torch on truck, spark, walk away. It's not that simple. There are many other causes in this case as to how this incident occurred. As to the use, I think that all the arguments are in the brief. And unless there are specific questions, I can address them. But, you know, the issue here is relatively simple. Does the exclusion apply? And I think I've made most of my points, if not all of them. As to that, unless you have questions on that, I can move on. So I understand it. You said we all read the facts, now you're confusing me a little bit. The Light and Power knew the truck was being brought in for maintenance. No. No, I believe that Light and Power... This is with their permission, I think. No, he asked to use the garage. It was in the middle of, I believe, January or February. It was very cold outside. He asked to use the garage, but the gentleman from Light and Power wasn't there at the time and said, yeah, you can use my garage. Within... Okay. You were saying he was using the garage, and I'm going to have to re-read this. He was using the garage, but they didn't know it was for maintenance. I don't think that he knew exactly what was going on in there, no. I don't know that that would change anything, but I don't think... My recollection of the facts, that specific fact, is that he didn't know exactly what was going on. But, again, it's been a few years since I've looked at that aspect of the facts, so I don't truthfully know. I apologize. Okay. Thank you. Thank you. If I can move on real quick to the waiver and estoppel arguments in our affirmative defenses and counterclaims. I think that's an issue that once the judge granted summary judgment on the duty to defend and indemnify, we still had the affirmative defenses of waiver and estoppel, which are completely separate from the auto exclusion. And I think that the judge improperly dismissed our waiver and estoppel claims. In this case, Country Mutual put one adjuster on this case. Country Mutual insured both Higgins and Light and Power. They sent one adjuster out to the scene. That adjuster talked to the Higgins gentleman and the Light and Power gentleman, said to both of them, they were standing there, and they both testified to the same thing. The adjuster, Stella, came out and was representing both sides of the first-party claims and told both, if this isn't covered under your policy, she says, to Light and Power, it's covered under Higgins' policy, so you'll be covered. Based on that, she said, go ahead and throw everything out. I've seen everything. So they stopped their documentation at that point and threw everything away. Did she know at that point that there was a truck involved? Yes. She knew exactly the cause of the fire. She knew that there was a truck involved. The truck was still sitting inside the garage because when the fire happened, the truck was inside because the gentleman from Higgins couldn't back it out. So the truck was there. The damage to the building that occurs. Well, did she know that there was maintenance being done on the truck at that point? Yes. She was told by, and we've seen this in the claim, though, she was told by Mr. Higgins and his employee that they were doing maintenance on the truck. So, I mean, there was no doubt. That's in the fire reports that I don't believe they were properly submitted to you, but it is in there, that everybody knew up front that that's exactly what was going on, was maintenance of the truck. So it wasn't until after they went back to the insurance company and they investigated this to determine what the contract said in reference to maintenance. Correct. Okay. And then at that point is when a letter, I think it was a week later, after she made these comments and everything had been disposed of, that Country Mutual sent a letter that said, we're denying your claim on Higgins' policy for your third-party claim. Now, it turned out in this case that Light and Power was drastically underinsured for his personal property inside the building, and that was the case that we proceeded on against Higgins. But how are you prejudiced, if I may ask you, it almost sounds like it's a negligent spoilation claim, except the insurer didn't spoil it, the client spoiled it. How are you hurt by that? The prejudice is the destruction of the site, whatever it was. At the trial of this, there were several pieces of evidence that we did not have and did not have the ability to put forth in front of the judge on this case to prove up. Now you're talking about the underlying case between Light and Power and Higgins? Correct. And we couldn't prove it up because of that. That's the detriment to us, but statements were made directly by Country Mutual. I cite for the fact that we had an inability to prove something up because I have to show a detriment to my client, and that's the detriment that occurred. But the statements that were made by Country Mutual, specifically stating anything that's not covered under your policy will be covered under his, were statements that we relied on and took action based on those, and then again the detriment occurred when we couldn't prove up certain things because we didn't have documentation of the damage. So as to the waiver and estoppel arguments, I think that the judge was wrong in dismissing those. It seemed to me that she conflated the issues of the auto policy exclusion with whether or not our affirmative defense is applied, which is the exact opposite of the way this is looked at. If you decide that there is no coverage under this policy because of the auto exclusion, then our affirmative defenses of waiver and estoppel become that much more important because if they waived or are stopped from arguing the auto exclusion, then those defenses would prevent them from even arguing it, which is what we argued in the trial court, but she dismissed those on 615 grounds that we couldn't state a cause of action on those. And the last point that I had raised in the appeal is the failure to grant the motion for a protective order, which granted is somewhat of a non-issue as to the total package of this appeal. I agree with that. However, as a matter of principle, I felt the need to address it. When country mutual ensures both sides of an equation like this, they must protect that attorney-client privilege, separate and apart from the fact that they represent both sides. When country mutual's attorney was hired in this case, he was only hired to represent country mutual on a claim that this particular claim was not covered under Higgins' policy. In transferring this case to their attorney, they took all of the claims file from the light and power file and sent it to their attorney. Country mutual's attorney argued all along in this case that they have the right to see everything that country mutual has, even the light and power file. And as I argued in the brief and as I will argue now, it's a fortuitous position that country mutual was in to defend and ensure both sides of this equation. They cannot take advantage of that fortuitous position to then tender even attorney-client privilege material of my client over to the other side. And I think that that position is something that's important. It's very important because of the size of many of these insurance companies. If they end up on both sides of one of these cases and they insure both sides, they don't have unfettered access. The attorney-client privilege extends to those comments made to your insurer, regardless if the other side is also insured by that same company. And other than that, I'm throwing that out there because I think as a matter of principle, it's a very important aspect of this. And I don't think that the judge in denying this, basically when he denied the protective order, his conclusion was there's really no prejudice here. It's just kind of a non-issue, so don't worry about it. But he did agree in his opinion that the transfer of the information to the country's attorney and the transfer of Leighton Power's attorney-client privilege material to others was wrong. He acknowledged that, but then denied the protective order. And unless there's any other questions, I will stop there. Thank you. Thank you. Steve Carlson for the Country Mutual Insurance Company. Of course I'd entertain any questions too, but just briefly to mention some of the points raised by counsel. I think as he said during his oral argument, everybody at all times knew this accident happened during maintenance of a vehicle. Mr. Higgins testified in the definition testimony that I cited, that the other side cited, that from the very beginning, the only reason this vehicle was taken into the building on a cold day was to perform maintenance, I guess in enclosed space because obviously it's colder outside, and using a torch to replace a muffler. Mr. Higgins, actually his brother David Higgins, is one of the principals of Leighton Power. So they're the two businesses, they're brothers, and they're right next door to each other apparently. So it's not going to be that unusual for something to help out and use your space. Well, they make the argument, Mr. Carlson, that we shouldn't consider the person's deposition. Rather, we should just focus on the complaint. They probably crafted a complaint to leave out the fact the motor vehicle was involved at all. Yes, they wanted to complain initially they did that. Well, I think what's instructive on that issue, and I briefed some of it, it's interesting the timing. The Supreme Court in Pekin v. Wilson just came out with a case that sort of adopted the analysis of the cases I cited in my brief from this very district in Cullibard and Root and Byrdine that, you know, it's proper to consider some of the materials and determine the duty to defend. There's no issue the declaratory was filed right away. It's not a crucial issue whether it was a motor vehicle or some other wheelbarrow being worked on at the time. Did you file a motion to cite additional authority, Mr. Carlson? No, I didn't yet, no. I mean, I wrote it. It's a law. Right. But I cited the cases from this district that said the same thing the Supreme Court adopted. So I was just following the law from this very district in my brief that I've already cited. That often doesn't help in this district, though we often disagree with one another. We're very familiar. Well, there's two different panels, at least, in Byrdine and Cullibard, and I was in one of the cases, actually. And, right, I guess it would be, if you get 20 people to agree on every point, it would be unusual. You wouldn't be human. You wouldn't be human beings, I think. So that, and I guess another argument I made is, and the reason why I mentioned about them relying upon their line on this definition testimony to make these facts or allege this chain of events of some bucket being left there and some sparks flying and then moving the bucket and being negligent in not extinguishing the fire and not controlling the fire and using the torch too close to the bucket, all these things that, but for the maintenance on the vehicle, this fire never would have happened. If something else was involved in making the argument, really, if they were working on a wheelbarrow, you know, forging a wheelbarrow, right, it wouldn't apply because that's not what the policy says. It applies basically, it's very typical, automobiles, aircraft, watercraft, people usually have separate policies for those things. There's reasons for that. Sometimes those things are identified as having different or greater risk involved. If the standard was just but-for, however, then you couldn't explain USF&G if it can be explained at all. And then also not be able to explain them in little hands because but for the fact the child was put in the van to be brought to the daycare, the child wouldn't have died in that. Well, I think the Pruitt case did a good job of explaining that and the trial court too. The trial court, you know, that's why I quoted it because I think it was very poignant, her analysis of that string of cases, starting with USF&G and all the other cases that seemed to apply to her analysis and her, I think, recognition of what some of those cases have said themselves, that it's tough to apply tort principles in a contract case. Tort principles apply to the underlying claim, whether there's liability, and then when you're determining whether a contract applies to Pruitt v. Law, you apply contract principles, not tort principles. But the Supreme Court in Northbrook did criticize that idea, did they not? Did not? I thought the Supreme Court in Northbrook criticized the idea of moving tort language in the contract case. Yeah, I think they did criticize it because they had all these theories that they failed to warn, you know, and the bus was, I mean, they're, I think, obviously, why are all these things alleged? Because someone's trying to get around a clear excuse. There's a reason for it. You see that all the time when lawyers are trying to do their job to find money where they can. And here we did have, you know, there was a policy that did provide first-party benefits for electing power, and they paid the limits of that policy. And there was a separate policy that State Farm had for the auto, which was paid. There was business interruption that was paid. But then there was an attempt to, you know, just jump ahead a little bit to the end of it about this affirmative sentences and counterclaims. There was a fire. Someone reported a fire. Someone called the insurance agent. We had a fire. So they sent somebody out there to see what happened. You know, they don't even know anything about it until they go out there. And all that they learned, okay, they're told, yeah, we were in this building working on a vehicle, and a fire started, and they burned the content. Okay, and that's what's in the log notes. That's what's reported. And this record, it's not in the record. There are all these detailed statements that we're going to fully cover you. If not covered there, we'll fully cover you. Why would they cut you this auto policy? They didn't insure the auto in there. Of course, they don't even know exactly what policies are applicable. They don't even have a policy. When you go out and you get called for a fire, to go out and look at a fire, someone says, oh, we had a fire watch at our property. You don't have the policies yet. There was no, like, intentional, like, wait a minute. We had this auto exclusion. We know it applies, but we're not going to raise it. That would be intentional. That would be a waiver. It says someone goes out there, looks at a fire. Okay, there's a fire. And then they go back. Someone else orders the policies and they get the information. They pay off the first-party claim right away. Like you said, a week later. They say, wait a minute, under this particular policy, this one doesn't apply. The other one applies. And they tell them why. I mean, it's very record. And there's no, the lawsuit's not even filed until, you know, over a year later or more, the tort lawsuit against, for damages in the fire. But they do raise an interesting issue, Mr. Carlson, the one coming up all the time on these cases, where Country Mutual represents two different insurance involving this. And they are at loggerheads. One is pointing the finger at the other. In this case, if you know, did Country Mutual pay for the outside representation for either Light and Power or Higgins? Well, Higgins didn't have any, I'm sorry, Light and Power didn't have any outside representation because there was no claim made against Higgins. There was nothing to defend. They didn't pay for the lawyer for Light and Power. They filed a declaratory judgment action right away, as the Supreme Court encourages them to do. And so they didn't have an attorney to use any information. And that's sort of like the red herring of this whole thing. What privilege information is there? The trial court here, when granting the motion, there's nothing that they relied upon other than what everybody admits happened, that there was a fire when he was doing maintenance on the truck. I mean, that's what he admitted the day of the incident. He told the other side. He told Light and Power that's what happened. So how can you maintain a privilege anyway if you tell the other side the same information you tell everybody else, you tell the fire department, you tell everybody else, unless nothing was about that issue about releasing information back and forth. My issue was when you have one company representing two insurance and they're at loggerheads, and it's about the policy. I mean, Light and Power is trying to avoid that maintenance problem because there's an occlusion on it. Usually the answer is only in the last four years have you really started paying attention to this. Our courts are saying under Avila and other cases, you know, if they're at loggerheads, you better have separate counsel. And I'm just asking. This is not from the briefs. The opinion won't attack anybody for having conflicts. I'm just asking. Where was their outside counsel brought in by country mutual? I guess if they're outside counsel, I guess if they had defended under reservation rights instead of filing a declaratory, maybe they would have had to advise an independent counsel and do that. But they did the other route that the Supreme Court authorizes, file a declaratory judgment action. So they never faced that ethical, I'm not even assuming it is one, but they couldn't have even faced any ethical dilemma. And here the thing is, what is the, it's never been shown what is any privileged information. It was never used by anybody. It certainly wasn't used by country mutual. It wasn't used by the trial court. There's nothing there, and there couldn't have been a privilege. I mean, it's not an unusual situation where someone would go out to a, and that was the only visit by country mutual to the facility. The only interview was the one time at the time of the, just after the fire. You know, you're going to go out to a fire and find out, and then all of a sudden, because you asked somebody a question and now it turns out that there's no one there who also had a country mutual policy, then all of a sudden from that, you've already, why don't you send out five people in case you insure everybody at first? You know, when you first go out to a fire. What happened? Nothing happened either. This is, that's why the court found it wasn't germane. You know, they looked at all of the log notes. They judged Siebel, that we had a mediator, who found that there was no privilege issue. I'm not concerned at all about it. There's no need for instruction, I think, in this case. I'll show you a different issue. No, nobody, they just mentioned it, and I mentioned it. But it's an interesting topic. I mean, I mean, it's kind of. No one in this room was wrong. No one. So, you know, we get to these, you know, this underlying trial, you know, there's a lot of statements about the underlying trial, too, but that's not in this record here. I don't know exactly what happened in the trial. My understanding is there was not even a court reporter there. So, but, you know, Light and Power was a trial against Higgins and got a verdict. And I don't know what this, there's some reference, there's some evidence out there that it didn't have because it was thrown out. Of course, that's not, that's kind of total speculation. There's nothing in this record. And they got their verdict. There's sort of a claim saying that, because they're signing the deferred offenses of Higgins and Light and Power and saying that if they had this evidence, the verdict would be even bigger against Higgins. How could that have prejudiced Higgins? It's over prejudiced because the verdict wasn't bigger? I mean, they're, I guess, benefited in any respect. But those, those are all, you know, there was no reliance, really. There was no, we had, they had a policy. First of all, also, there's so many different issues out there, like this vague statement, oh, everything's covered. The appeals courts have frequently found that those statements, there's no evidence that that was even made by country mutual and all. The seller, the seller was never, has never been deposed in the case. There's no reference to that kind of statement in the log notes at all. It, you know, there's someone saying, yes, your policy. There was policies that were paid in full in the case. There were policies that applied. The personal property of Light and Power, the State Farm Auto Policy, the business interruption coverage were all, were all paid. There was coverage provided, but not on every policy. You know, if they had a vote policy, it wouldn't apply. It didn't apply to many policies. It doesn't necessarily apply to every loss. The policies that apply to the loss were paid. The additional policy that, naturally, someone wants to tap into to get more money did not. And the court found that, believe correctly, the detailed analysis of this whole chain of thought and was troubled by the appeal court because the comment she made about this intermingling of the court principles with contract principles and all these other courts, some of them have explained in a little different language, too, in USF&G, that the Pruitt court explained. The policy coverage, all of the operations, you know, it was, the language was different of the policy, and the, and the accident was different. It's, and I don't, I don't have too much more because I think I'm, I'm starting to repeat myself. And you have all the briefs. And this, this argument, you know, the, the example in the Oakley case that they gave, all but where the car is incidental, where it was a, a platform, like the kids were just playing on top of the vehicle as a playground type device, as opposed to any use of a vehicle. You know, the fact that a car, a car being used typically is an accident when a car is moving. That's when there's chances of something, an accident happening. But when you do maintenance, you're typically not moving a car. You might be sometimes. You might be in the middle of moving a, a tip mortar off on that. You would be doing maintenance on a steel vehicle. But it doesn't matter. The fact that there's more cases on use than maintenance doesn't change the fact that the policy excludes coverage for maintenance of the vehicle, where you're working on a vehicle that contains oil and gas and you're using tools. Policy view, and basically the suggestion, well, they use the tools, so therefore it takes it out of the vehicle. But how do you do maintenance without tools? And the only reason you're using a tool is to do maintenance. That's the only reason, not for any other purpose. So it's not so attenuated at all. It's directly, it's the only cause and only reason, only, every, everything is tied to the maintenance. Without the maintenance, there's no accident, there's no damage, nothing happens. Thank you. Any questions? Thank you. Thank you. But for putting a child in a van, it can't die eight hours later. The only argument made by country, and they're brief, and the only argument made today is but for the maintenance, this doesn't occur. It's not that simple, as Justice Quinn pointed out. It's not as simple as but for maintenance occurring, this incident doesn't happen. There are many other causes here where in those other cases there were not. That's the difference between this one and I, you know, the only argument that I've seen in all the briefs and even in counsel's statements, but for the maintenance occurring, this doesn't happen. And the argument is just not that simple. The, I just want to touch really quick on the aspect of the statements made to Stella. Counsel's arguments is that the attorney-client privilege essentially doesn't attach because there was nothing useful within the statements. That's a backhanded way of looking at attorney-client privilege. The usefulness of the statements, what came out of the statements, is not what determines whether there's an attorney-client privilege that attaches to them. As long as the person is providing information to their insurance company about the facts, the attorney-client privilege attaches. It doesn't matter in the end that they chose not to use it. It doesn't matter in the end that it might not have been relevant to them in their case. The attorney-client privilege attached. So that's all I wanted to add on that. Thank you. Thank you. Thank you. I'm going to take the case under advisement. Ms. Glover next case. Please approach the podium. Tell us who you are, who you represent, and approximately how much time you need. I'm Jonathan Yeastie on behalf of Chris Dawson. I've got about 15 minutes, and I'd like to hold out three for rebuttal, please. Thank you. My name is Bill Papanetti. I'm an assistant state attorney for Cook County. I'll only be here for 10 minutes. Thank you. Good morning, Your Honors. The court will recall Chris Dawson was convicted, among other charges, of two counts of aggravated unlawful use of a weapon. The counts were simply for possessing a loaded weapon on his person and in his vehicle. It seems as we approach where we are today that the vehicle charge still remains at issue. And these provisions are among some of the most sweeping prohibitions on firearms in the country. While we raise other issues in the brief, I believe that the court's interest may be in this issue. I would note that McDonald v. City of Chicago is still pending in the United States Supreme Court, and hopefully that will come out in this court in more clarity. I think it will actually say, McDonald v. Chicago, it's okay to shoot at cars in the alleys of Chicago. I think it will clearly say what Heller said, that the right to keep and bear arms includes the right to carry arms. And the only clear distinction on the facts as to this charge, which is the simple possession of a loaded weapon charge from that in Heller, is whether the right to bear arms exists outside of the home. And all the history of the text of the Constitution indicates that the right doesn't simply end the second one steps outside. So just going back to Mr. Carlson, or rather Mr. Dawson rather, how will he be held by that? Let's assume you're right, that the U.S. Supreme Court, those five conservatives aren't there, and obviously you're very familiar with Heller. I think it's a great idea, everybody should be packing heat as they walk up and down the streets anywhere in the United States, except in our courtrooms where they may shoot us. We need protection, but nobody else does, so go shoot the old lady. Assuming they say that, how is Mr. Dawson held since he has concurrent time on an aggravated discharge where he was using this gun to shoot at a fellow's car? Because it would then necessitate vacating the aggravated unlawful use of weapons conviction. And there's all sorts of direct consequence to that conviction, even independent of the concurrent time. What would that be? For example, look at the specific sentencing provisions of the aggravated unlawful use. Having a second offense for that charge requires a greater sentence, whereas if it's simply for a different felony, it is not. And even if there were no specific sentencing provision, the fact that there's a charge in which he isn't right now in prison would certainly establish standing for his constitutional argument. Okay, go ahead. Are you asking us basically we should overturn the Supreme Court, or are you asking us to look into a crystal ball and decide? I'm not asking either. I'm asking if you'd simply draw the logical conclusion from Heller v. District of Columbia. There's no Supreme Court precedent which stands in the way. And I am asking you, Your Honor, to overturn one opinion. Are you saying what Heller said, it applies to the state's fundamental right? Heller did not specifically hold that it's a fundamental right. It laid out a syllogism for this court to complete. And this court, I believe, should complete that syllogism just to say the Washington Supreme Court did in the Sias case that's discussed in the reply brief. And that means we look to the history of the right, and here that entire history is uncontested, from the fact that Blackstone said it was fundamental at the time of the English Bill of Rights. He's an English fellow, right? Yes, he is. And here, notably, the type of— We had a revolution against those guys, didn't we? Well, the test, of course, is whether it's necessary to an Anglo-American theory of jurisprudence. I mean, I know in the NRA case, for example, Judge Easterbrook makes a slight date on foreign law for the reference to English law here. Yes. Scalia hates any other judge using foreign law. He loves pre-Revolutionary War English, what I would refer to as English Protestant law. I have a long theory of why he does that, but that's another date, another— The reference in Heller was that the right was fundamental to English subjects at the time of the founding. Right. And we tend to forget that at the time of the founding, the framers were English subjects, or at least had been a couple of years before. So that the right was— But somebody threw them off. Not even my forefathers. They're still in Ireland. Go ahead. That history is uncontested here, and it traces through all the earliest state constitution protecting the Bill of Rights, through the specific intent of passing the 14th Amendment. I'd have to answer questions about that history. But where the discussion is, and this is where the court, I believe, decided Wilson wrongly. You steered us right over Wilson. Tell us why we were wrong. The incorrect holding there was following NRA in believing that there is some U.S. Supreme Court precedent standing in the way of incorporating—in finding the right to bear arms incorporated as part of substantive due process. The United States Supreme Court has never said that the right to bear arms is not part of substantive— is not protected by the due process clause of the 14th Amendment. It has done— We reviewed it three times and affirmed the idea of local ordinances, that the Second Amendment not applying to individuals. They said it three times. So prior to Heller. And Heller made it clear, yeah, we said it three times. We're new guys and we're going to say what we want to say. And we're going to skip over Presser at all. We're going to go right back to our buddy Blackstone. So, go ahead. Well, I would say that Presser and Cruikshank do remain binding law. Cruikshank, for example, found that both the right of assembly and the right to bear arms are in the Bill of Rights, do not directly bind the states. Neither of those has been overturned. As to the right to assembly, for example, DeYoung v. Oregon came down, which said, yes, it doesn't directly bind the states, and nor is it even part of the privileges and immunities clause of the 14th Amendment. However, it is part of the due process clause. We see that this has been the basis for most of the constitutional jurisprudence of the past century. For the right to speech, for example, when Gitlo v. New York came down, it said, yes, we recognize these prior precedents, Lauder House and Barron v. Baltimore and all this. The right to free speech doesn't directly— The Constitution doesn't directly bind the states. It isn't incorporated as part of the privileges and immunities clause, but the substantive due process is a separate area of the law. Well, when they made that argument, even Mr. Scalia said, oh, I'm not going down that road, which doesn't mean, of course, he's not going to go down that road eventually when he comes out with— or the Supreme Court comes out with the Chicago case. But the idea of overturning the Slaughterhouse case is, if Scalia's afraid to do that, certainly we're not likely to go ahead and do that. This Court definitely does not have to overturn the Slaughterhouse case. Slaughterhouse cases are limited to the privileges and immunities clause. While there may be some that have some interest in trying to revive that clause for other motives, the motive here is simply to get relief for Chris Doss for the violation of his basic right to bear arms. And we should look at the natural home for that for whether a right binds the state, and that's the due process clause. We use the due process clause for all the First Amendment protections, the Fourth Amendment protections, the Fifth Amendment, those Sixth Amendment protections that have been incorporated. There's no reason why we should uniquely exclude the Second Amendment for those kinds of protections. Further, Your Honor, I'd point out that, you know, some court, every court that has gone on to actually do the historical analysis, do the analysis that's required by Duncan, that even that cryptic footnote in Heller says is now required, has found that the right to bear arms is deeply rooted in history and tradition. And that means that the right is fundamental. There's, of course, another consequence that flows from that. But they could have said that, right? If they could have said it, as we point out, as Justice Murphy points out in the very well-written opinion in Wilson, they could have said it was a fundamental right, but they chose not to. There are nine pretty smart guys up there. I disagree with them on lots of stuff, but I would never say they're not intelligent. They could have said it was a fundamental right, and they chose not to. Now, the oral arguments on the Chicago case, they said, of course, we meant to say that, but, again, we'll see what they say at this time. They had a chance to say it was a fundamental right. They chose not to. It's not a fundamental right yet. Your Honor, I would suggest that it's been a fundamental right at least since 1791 and certainly since 1868 when the Reconstruction legislature decided to push these things in the 14th Amendment. Indeed, part of the reason for the 14th Amendment was to prevent the disarming campaigns of KKK going on in the South. If you honestly believe that the one reason the 14th Amendment passed was to arm black people, go ahead. I know Scalia said that. It's showing, again, what type of fellow he is. He'll say whatever he thinks, but I don't think he's a rational person. I would suggest we're bound by the Supreme Court's interpretation of that history. Your Honor, there's another consequence to the finding that the right is fundamental, and I'll agree that it has stopped short, but we have a test for what happens when the court stops short of saying it's a fundamental right. We apply the test. Is it deeply rooted in history and tradition? Is it necessary to an Anglo-American regime of order and liberty? If we find that's the case, then the right is fundamental, and certain consequences attach to such a finding. That, for example, it means that we have to subject it to more than mere rational basis review, otherwise we're essentially ignoring that choice to place the right in the Constitution. Now, it's not completely clear what precise standard we use to test the right to bear arms. However, under any of the standards that are out there in the emerging case law, this particular statute has to fail. Well, you say Skane. Yes. Unfortunately for you and I, Skane was vacated in February of this year. Yes, sir. He was granted re-hearing on Bonk. So I guess all of them are going to get together someday and listen to this argument. I'm sure after McDonnell comes down, I bet that's their plan. Go ahead. I would suggest that this court shouldn't wait for McDonnell to address the issue. While it's perfectly possible that the U.S. Supreme Court will decide McDonnell next Monday, it might well be the case that they wait until the fall to decide it. It might well be the case that, who knows, the mayor might settle and root out the case. No. No, as they say, a Sudan will hold the Winter Olympics before that occurs. Going back, though, I'm surprised that you have that position because I think your best hope is McDonnell. Certainly not the same panel that wrote Wilson. We're unlikely to suggest that just based on that. To say, oh, we were wrong. We rethought it and the NRA has now convinced us that everybody in Chicago should take heat. What the heck. It's a brilliant idea. The earlier hope is for McDonnell to come down. And then we won't be able to say as we had to say, I'd suggest to Wilson, we're going to follow Caledemos because it's our U.S. Supreme Court said so. And I can't tell them they're wrong. I never have. I never will. Whereas the U.S. Supreme Court can say they're wrong. They can change the world. The U.S. Supreme Court, Your Honor, has already said that Caledemos is wrong. Is Caledemos' entire finding on whether something is a fundamental right is based on one and a half sentences of saying it's not individual, so therefore it can't be fundamental, and then citing the United States versus Miller. The question is how that was individual because in Illinois it is individual. Yes, under the Illinois Constitution it is an individual right. Right. Caledemos, I mean, it's been all one and a half sentences on the federal right. Well, since there were three U.S. Supreme Court cases, I'd suggest directly on point saying that's not an individual right. We knew it's not an individual right. I don't know how else they could have come to any other conclusion. So it's a sea change. That's to say that Teller doesn't say exactly what you say. Those cases have been read differently now. And I would suggest, Professor, By who though, right? Well, the United States Supreme Court, reading its own history, has expressly said that any judge that draws the conclusion as to the federal right from the United States versus Miller that it's not an individual right is wrong. Wrong is the Supreme Court's word on that. And this Court, for example, didn't wait for the Illinois Supreme Court to say Ohio v. Roberts was overturned before you started applying Crawford. Right, but there was hope then. On your side now, just going back to the various roles we play in this courtroom, there was hope that under Crawford that you'd get a better hearing, and we have to follow that, I'd suggest to you. There was nothing directly contrary to Crawford from our Supreme Court aspect. Whereas here, there is. It's exactly on point about local home rule communities being able to ban handguns. There's a case in Caledonia that's exactly on point on that. Unlike, I guess, in Crawford where Apprendi or other new-found rights by the U.S. Supreme Court, there are no cases directly against those. Go ahead. And as we're discussing Caledonia as to the state provision, I'd suggest we can't consistently maintain Heller's reasoning, which says that if we subject things to mere rational basis review, then any regulation on guns ends up passable, with the sort of bizarre reasoning of Paladimos, which is this provision protects at least some right to bear firearms, yet we will still subject it to rational basis review. And that means that we need some kind of higher standard. I mean, what's remarkable about this particular provision, it simply bars the possession of a usable weapon in an automobile. And it doesn't make, while it's charged as a handgun in this case, the provision simply is sweeping enough to sweep in all firearms. And even Paladimos says, we're sweeping in all firearms, we're in some trouble. So it's a question of how do we reconcile. Well, that's going to go back to their argument, the state's argument, that Heller involves a home and Paladimos involves a... Your argument is based on the ability to carry sidearms, or in this case, any firearms, in a person's car. They argue that Heller really only plans for the home. That was the issue with Heller, right? Your bet is that Heller, rather than the Chicago case, will go further than Heller and say you can put it in your pocket, right? Well, Heller itself went further than the home. Why would we have a right to bear arms? It identified self-defense as one of the purposes. It certainly didn't limit self-defense to just the home. Look at the other purposes. That's correct. Terrorists in a militia. I don't think one's doing that in one's kitchen or living room. Hunting. That's correct. The entire deep history here, which is early English rebellion to British game laws, whatever that is, it's not in the home. Even past that, certainly the text of the Second Amendment doesn't limit it to the home, nor would look at the case file that's emerging on this. There's the Seventh Circuit's scoring opinion, while it's now stayed, that was a case where it was a hunting rifle in somebody's vehicle. The case out of the Washington Supreme Court, they didn't go into any detail analysis saying that I forfeit the right when I step outside of the home. That was a case involving a handgun requirement in a vehicle stop. I suggest, Counselor, that's exactly the problem with this whole Second Amendment issue. The problem with handguns is not hunters driving in central Illinois going from place to place with their shotgun on the floor of their car. The problem, rather, is with gangbangers on the south and west sides of Chicago shooting each other on our streets, which is what occurred here. That's a drawback. That's where the problems arise, the conflict arises. How do you apply this? Theoretically, absolutely, the law applies the same. So, therefore, if we are going to say that hunters should be allowed to carry their shotguns inside the body of the car, we should allow the gangbangers to carry their shotguns and machine guns and handguns in the body of their car. It's just unlikely you're going to find us say that before the Supreme Court orders us to say that. I think, speaking for myself. We're in opposition. I think so. Safe to say. But, you know, at least, you know, there's certainly, you know, it's not the case, you know, for the home that, sure, perhaps it's the case that self-defense in the home is a slightly stronger interest than self-defense outside the home. Even that's disputed. The dissent, you know. Well, can we backfill this? In the real world, this case is not about self-defense at all. There's little guys driving around shooting repeatedly in front of a squad car. They see where the door is, and I'm your client, and I'm shooting at the other guy's car here, and there's a cop there. Don't move. I run inside. I toss three guns out of a window. The guns are all recovered. They've all been used. That's what this case is. It's not about self-defense at all. So when we raise the flag, oh, but self-defense, I had nothing to do with this case. Well, self-defense is a reason for having the right. It's not the right itself. The right is a right to bear arms. It's, you know, no more different than, you know, there's other purposes for having the right, you know, such as hunting or, you know, I suppose, malicious service or as a latent threat as a shotgun hearing. But the right that the framers chose to put in there is a right to keep in their arms. And, but there, Your Honor, if we wanted to reach people with malicious intent, there's another statute that can do that. That shows the failure of any sort of tailoring necessary to the spare possession statute. This statute actually does reach the hunter that has the shotgun in his car. There's other divisions of this court have consistently held that against attempts, you know, to challenge the statute for rational basis review. Consistently. Right? I mean, no, Marin, McGee, Sowell, Austin, all have said, yeah, this applies to everybody. Yeah. In Marin it says it's, it expressly applies for no criminal intent existed at all. Right. And even if we were going after gangbangers, not only in this case is my client not one, he was actually acquitted of being a street gang member, you know, possessing a handgun. You know, it's one of the consequences of the state's attempt to charge this with 16 different theories of accountability. Well, that's what you discussed in Marin, is what was going on. And so the question then becomes, it's a, you're not taking this under vagueness. You're arguing that it was over breadth, and more particularly now you're based just on Heller, that Heller would still allow your client to do what he did here, other than the physical act of shooting another human being. Right? Yeah. The aggravated discharge statute is not at issue. Okay. The very purpose of having a Bill of Rights is to withdraw certain subjects from the political controversy. The framers chose to make this subject among them and withdraw it. I, Mr. Dawson, myself, ask this Court to respect that decision. Could you address the sentencing, just briefly? The question of remand for resentencing, Your Honor? Yeah. The two cases that are going to be there are Lejos and Johnson. They stand for the proposition when if some but not all of the charges, and it looks like at least two of the five charges here fall away, are vacated, then if the Court treated them together as a package, if the Court didn't make some sort of distinction between them, or if we can't be sure, then we should remand for resentencing. Here, the Court simply treated it as one offense, said the offense, eight years, the same sentence on each of the aggravated discharge counts, even though there is some separation between them in the two instances, and three years on the Aggie UW. Okay. You laid it out pretty well in your brief. I think Johnson and Lejos is the only case I've actually developed in there. Thank you very much. Thank you. Good morning, Your Honor. Once again, my name is Bill Taffanetti. I'm an assistant state's attorney. I must confess I am nowhere near as well versed on the issue of the Second Amendment as my opponent is. Nonetheless, I think he is as wrong as wrong can be about this. The statute in question carries a very strong presumption of constitutionality, and the party challenging that statute has the burden of rebutting that presumption. This Court has a duty to uphold the constitutionality of the statute if it is reasonably possible to do so. Not only is it possible to do so reasonably here, I think it's absolutely essential. The Heller opinion specifically defines the question to be addressed by the Court as whether the District of Columbia could prohibit the possession of usable handguns in the home, whether that violates the Second Amendment to the Constitution. The issue before the Heller Court thus was predicated on two specific things that do not apply in our statute. One, it was limited to the District of Columbia, and there's no... Well, every federal enclave too, right? So military bases, national parks. I'm sorry, Your Honor? It applies to everywhere in federal government, right? So it's not just... Well, there's the question of incorporation. We don't know yet. Well, it's a space. This would apply in every federal court in the land, right? I'm having a hard time hearing you, Your Honor. The Heller case would apply to every federal court in the land, correct? So if somebody wanted to have a gun in the Shawnee National Forest, that case would apply. If they wanted a gun at Fort Sheridan or at the Great Lakes Naval Base, that Heller would apply. Yes, any federal jurisdiction. That is correct. But more importantly, what it talks about is the prohibition it addresses is the possession of a lawful firearm in the home for the purpose of self-defense. The court repeatedly says that the issue is whether it is permissible to keep the gun in the home, to carry the gun in the home. It never goes beyond in the home. It specifically states that it's not applicable at this point to anything beyond the home. Let's talk about the right to bear arms. They discussed it, and it's mentioned in the dissent, saying that the right to bear arms is not even an issue raised, but Scalia put it in the majority anyway. So you know that people have a right to bear arms, and so I know he meant it because of the sense that it called them on it. So nobody raised that issue except you, Mr. Scalia, and you kind of made that up. Oh well, that's in there. So he did say Mr. Easton is absolutely correct. The statute in question is written so as to be perfectly consistent. It's almost as if it was written after the Heller decision. It specifically accepts the possession of firearms in the home, place of business, or on one's property. So the Heller decision, or the statute simply isn't covered by the Heller decision. The decision is a very narrow one, and until the Supreme Court sees fit to broaden it, the presumption of constitutionality must stand. I should point out further that the issue of whether it is a fundamental right has not been addressed, the issue of which scrutiny has not been addressed, incorporation issue has not been addressed. We're dealing with a very narrowly tailored decision. It may or may not be broadened in the future, and as a result, the presumption of constitutionality, which binds this Court, must survive, and it must prevail. As to the sentencing question Your Honor asked, the lesser included... You failed to tell Justice Quinn and myself how right we were in the Wilson case. You were proven right. It goes without saying. I apologize to the Court for that grievous oversight. Thank you. The lesser included offenses were sentenced separately. Every charge was given a separate sentence, so there's no reason to think that the presence of the lesser included, should one be vacated, would have any application whatsoever on the sentence for the aggravated discharge, which would remain viable. If there are no further questions, Your Honor, I would ask that the convictions then be... Thank you very much. Thank you very much. Other questions, Your Honor? Questions? Actually, why don't you kind of... You have something in your mind? Go right ahead and say it. I have a question for you. I know this Court has an interest in seeing what McDonald's is going to do, and we're all waiting on it. And counsel emphasizes, you know, as a simple presumption, the burden. I'd suggest that if it falls within the scope of the right, that burden shifts to the state. And that's what that disjoint opinion falls, just as once something steps on a First Amendment religion, right, or a speech, right, or a protection, right, then the burden falls to the state to tell us why they aren't burdening the right and to show that this statute is necessary. Even if this Court decides that we shouldn't, you know, vacate those convictions now, at least you can, you know, order supplemental briefing, especially if McDonald's comes down in the next few weeks, on the question of decide where the burden is and figure out how to solve it. Justice Floyd did. Speaking just for myself, and counsel Tuffman is absolutely right, Mr. Easton. You're obviously very familiar with the holdings of the Second Amendment. The cases are rising out of power. He makes a point, too, there at the end, that the Wilson was not a criminal case. It had nothing to do with the Illinois' UUW statute. It had everything to do with whether or not you could own guns in Cook County. It was directed against the Cook County ordinance, specifically the assault dam gun we have here. He makes the point that the UUW statute, and therefore the aggravated UUW statute in Illinois, in no way conflicts with Heller as Heller is clear in the sense of owning guns in your home. Illinois doesn't prohibit that at all. Chicago does. But Illinois does not. And so here your client was not charged with a violation of the city ordinance. Rather, he was charged with a violation of Illinois' law, the state law, which prohibits nothing on your own land and abode means had he been at home, instead of being on his front doorstep shooting at this fellow, had he shot him apparently from his own home, his apartment, he wouldn't have been charged necessarily with UUW, just aggravated discharge. Do you have a reply to that? Yes. The Supreme Court in Heller, as the Supreme Court often does, put out an opinion that was far broader than the question presented. Counsel is right that the question presented was whether a security guard has the right to keep the gun in his home for self-defense. The question answered was, you know, is there a broad right to keep and bear arms? And how we answered that question depended on reasoning that, you know, is reasoning entirely outside the home. Are you familiar with the Hasseny, Illinois case? I looked at Heller, other than Wilson, and I ran Wilson, and we're alone. Nobody cited it yet. We're probably just so correct, I guess. But, again, that was a simple case. And so no criminal case has cited Heller yet to say that it doesn't apply in Illinois. I mean, in a sense, our statute, state statute, is not implicated in Heller at all, other than the one line by Scalia saying, yeah, the right to bear arms is important, self-defense is important. Indicating, I agree with your interpretation, yeah, you can have carry a gun on the street. Sure you can. And that's not what it says, but you could read it that way. But no criminal court has addressed that yet? No court of review has addressed that? I'm not aware of any published opinion that has addressed that issue. And as far as I'm aware, there's no published opinion yet from any... Are there some Rule 23s out there you're aware of? Are you aware of any Rule 23s? Yes. Really? Somebody wrote a Rule 23 addressing Heller and didn't make an opinion out of it? Yes. Was it in the first instance? Yes. What a surprise. But it wasn't me, was it? No. Oh, thank you. I didn't think that. I think I have a small theory. There's a reason a published opinion in the country has come out with, you know, the right to carry arms is only a right to carry them from the living room to the kitchen, because the 100-page, you know, almost all of Heller... There's still time for one to be written, I'm sure you've seen. Thank you. Thank you. The court will take the case under advisement. The court will be in recess.